## HAUSER v REILLY

Docket No. 159444. Submitted December 20, 1994, at Detroit. Decided July 18, 1995, at 9:05 A.M. Leave to appeal sought.

Jamie Hauser brought a paternity action in the Monroe Circuit Court against Lorrie Reilly, alleging that he is the father of a child born to the defendant while she was married to another man. The court, William F. LaVoy, J., summarily granted a judgment for the defendant, ruling that under the Paternity Act, MCL 722.711 *et seq.*; MSA 25.491 *et seq.*, the plaintiff lacked standing to bring the action. The plaintiff appealed.

The Court of Appeals *held:*

1. The Paternity Act, as construed in *Girard v Wagenmaker,* 437 Mich 231 (1991), does not confer on a putative father standing to bring an action to determine the paternity of a child born while the mother was married to another man where, as in this case, there has been no prior determination that the child did not issue from the marriage.

2. In the absence of a parent-child relationship that goes beyond the biological link between the plaintiff and the child, the plaintiff cannot claim that he was deprived of his right to due process under Const 1963, art 1, § 17 when denied standing to bring an action under the Paternity Act.

3. The Paternity Act does not accord different treatment to persons under similar circumstances and, as applied to the plaintiff, does not deny him his right to equal protection under the United States Constitution because the circumstances of the plaintiff and the defendant are not similar. The plaintiff has never had legal custody of the child and has never shouldered responsibility for its care, while the defendant has been responsible for the child's care on a daily basis since its birth. Affirmed.

T. G. KAVANAGH, J., concurring in part and dissenting in part, stated that the Paternity Act, as interpreted and applied by the majority, denies the plaintiff his fundamental right to due process under the Michigan Constitution. Once the tradi-

REFERENCES

Am Jur 2d, Bastards § 85.
See ALR Index under Legitimacy of Children; Parties.

tional marriage covenant is broken by an extramarital relationship, the state's interest in preserving the unitary family is diminished, and the putative father should be afforded the minimal due process right of a hearing to determine paternity.

PARENT AND CHILD — PATERNITY ACT — PUTATIVE FATHERS — STANDING.

    A putative father lacks standing to bring an action under the Paternity Act to determine the paternity of a child born while the mother was married to another man where there has been no prior determination that the child did not issue from the marriage (MCL 722.711 *et seq.*; MSA 25.491 *et seq.*).

*Daniel S. White,* for the plaintiff.

*Pamela A. Moskwa,* for the defendant.

Before: DOCTOROFF, C.J., and T. G. KAVANAGH[*] and R. C. LIVO,[**] JJ.

DOCTOROFF, C.J. In this paternity suit, plaintiff Jamie Hauser appeals as of right from a November 20, 1992, order granting "summary judgment" in favor of defendant Lorrie Reilly. We affirm.

The case concerns plaintiff's standing under the Paternity Act, MCL 722.711 *et seq.*; MSA 25.491 *et seq.*, to claim that he is the father of Lynnae Rae, born August 5, 1991. Plaintiff's complaint, which was filed on July 16, 1992, alleged in relevant part:

    5. That the aforementioned minor child is the product of the union between the parties hereto during a time in which Defendant had filed for Divorce from her husband John Reilly, Sr.
    6. That Plaintiff is informed and believes that Defendant never followed through with said Divorce and in fact may still be married to John Reilly, Sr.
    7. That while the minor child was not techni-

---

[*] Former Supreme Court justice, sitting on the Court of Appeals by assignment pursuant to Administrative Order No. 1994-7.

[**] Circuit judge, sitting on the Court of Appeals by assignment.

cally born out of wedlock, both of the parties hereto believed the child to be the natural child of Jamie Hauser and in fact submitted to blood tests.

8. That the test results came back with a probability of paternity for Jamie Hauser of 99.99%.

9. That the aforementioned blood test, in addition to the parties consent to same is a determination that the minor child is not an issue of the marriage between the Defendant and her present husband.

As relief, plaintiff sought an order of filiation and visitation rights, plus an award to defendant for child support.

On October 5, 1992, defendant filed a motion for "summary judgment" and costs under MCR 2.114(E) on the ground that *Girard v Wagenmaker,* 437 Mich 231; 470 NW2d 372 (1991), was directly on point in this case and stands for the proposition that plaintiff lacks standing to bring this lawsuit because defendant was married when the child was conceived and born. The motion was supported by defendant's affidavit. The trial court held that it was bound to follow *Girard, supra,* awarded costs but not attorney fees, and dismissed the suit.[1]

In *Girard, supra,* our Supreme Court concluded that the putative father did not have standing to bring a claim under the Paternity Act. The Supreme Court denied the putative father standing under an interpretation of the statute that required "a prior determination that the child is not the issue of a marriage." *Id.* at 246. The Supreme Court's opinion in *Girard* focused upon rules of statutory interpretation, and expressly declined to review "any constitutional questions." *Id.* at 234-

---

[1] The trial court entered an order granting "summary judgment" in favor of defendant. We will review this case as an appeal from an order of summary disposition pursuant to MCR 2.116(C).

235, n 3. Dissenting, Justice CAVANAGH (joined by Justice LEVIN) concluded that the majority's interpretation of the Paternity Act violated the putative father's right to due process under the Michigan Constitution, Const 1963, art 1, § 17. *Girard, supra* at 276-278 (CAVANAGH, J., dissenting).

First, plaintiff claims that our Supreme Court's holding in *Girard* was contrary to the intent of the Legislature. A decision of the Supreme Court is binding upon this Court until the Supreme Court overrules itself. *People v Mitchell,* 428 Mich 364, 369-370; 408 NW2d 798 (1987). Therefore, we may not revisit the issue of the Legislature's intent with regard to the Paternity Act. See *Spielmaker v Lee,* 205 Mich App 51; 517 NW2d 558 (1994).

Second, plaintiff argues that our Supreme Court's interpretation of the Paternity Act deprives him of his right to due process under the Michigan Constitution. We disagree.

Three different theories exist on the right of putative fathers to due process because of protected liberty interests in their relationships with their children. In *Michael H v Gerald D,* 491 US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989), Justice Scalia, writing for a plurality, determined that a putative father had no protected liberty interest in establishing and maintaining a relationship with his child when the child's mother gave birth to the child while married to another man. Justice Scalia reasoned that the United States Constitution did not grant the unwed father parental interests comparable to that of the married father. *Id.* at 130.

Justice Brennan, dissenting in *Michael H,* derived the putative father's liberty interest from the father's biological link with his child, combined with a substantial parent-child relationship. *Id.* at 142-143 (Brennan J., dissenting). Justice

Brennan specifically stated that an unwed father's mere biological link with his child is insufficient to establish a liberty interest. *Id.* at 143, n 2. The United States Supreme Court adopted a comparable holding in *Lehr v Robertson,* 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983).

Dissenting in *Lehr,* Justice White stated that a father's biological link with his child forms his liberty interest. The nature of the parent-child relationship is the biological link. The development of that relationship is relevant to its "weight," not its nature. *Id.* at 271-272. (White, J., dissenting).

We agree with the reasoning of Justice Brennan in *Michael H.* Following that analysis, if plaintiff in this case had an established relationship with his child, we would hold that he had a protected liberty interest in that relationship that entitled him to due process of law. However, because plaintiff has no such relationship, we hold that the Paternity Act did not deny him his right to due process.

The term "liberty" entails more than a right to be free from arbitrary personal restraint or servitude. In its broadest sense, it extends to the full range of conduct that cannot be restricted except for a proper government objective. A person is not deprived of liberty, however, simply because state action imposes burdens or subjects individuals to restraints in matters that affect public interests or the rights of others. *Slocum v Holton Bd of Ed,* 171 Mich App 92, 101; 429 NW2d 607 (1988).

Plaintiff would have us adopt Justice White's analysis in *Lehr.* While we sympathize with plaintiff, who was allegedly denied access to his child by defendant mother, we cannot agree that any putative father who could establish paternity by scien-

tific means has a liberty interest in all proceedings concerning that child.

It is true that both parents and children have a due process liberty interest in their family life. *In re Clausen,* 442 Mich 648, 686; 502 NW2d 649 (1993). The protected interest, however, is in the family life, not in the mere biological link between parent and child. A rapist has a biological link with a child conceived by that rape. If we held that a mere biological link would ensure a father of a liberty interest in the rights to a relationship with the child, the rapist would be entitled to due process protections. See *Michael H, supra* at 124, n 4 (opinion of Scalia, J.).

Third, plaintiff contends that our Supreme Court's interpretation of the Paternity Act in *Girard* denies him his right to equal protection of the law under the United States Constitution. Plaintiff claims that the Paternity Act discriminates between biological parents on the basis of gender and does not effectuate the state interest in preserving the sanctity of the marriage. We disagree.

The equal protection guarantees require that persons under similar circumstances be treated alike. Equal protection does not require that persons under different circumstances be treated the same. *Petrus v Dickenson Co Bd of Comm'rs,* 184 Mich App 282, 289-290; 457 NW2d 359 (1990).

Although the Paternity Act does treat biological parents differently, the statutory classification scheme is not based solely on gender. The Department of Social Services also has statutory authority to file a complaint on behalf of a child whose parents are supported by public assistance. MCL 722.714(8); MSA 25.494(8). Like the putative father, the Department of Social Services does not have standing unless the child meets the statutory requirements of a child born out of wedlock. *Dep't*

*of Social Services v Baayoun,* 204 Mich App 170, 175; 514 NW2d 522 (1994); but see *Dep't of Social Services v Carter,* 201 Mich App 643, 648; 506 NW2d 603 (1993) (the DSS has standing under the Paternity Act when it is undisputed that the child was born out of wedlock).

In this case, plaintiff and defendant are not persons under similar circumstances. Plaintiff is an unwed father who has never had legal custody of the child and has never shouldered any responsibility with respect to the daily supervision, education, protection, or care of the child. On the other hand, once the child was born, defendant immediately became responsible for the child and reinforced her commitment to the child on a daily basis. *Quilloin v Walcott,* 434 US 246, 256; 98 S Ct 549; 54 L Ed 2d 511 (1978). Because the Paternity Act does not treat persons under similar circumstances differently, we find that plaintiff was not denied his right to equal protection under the law.

Although we do not find that the Paternity Act is unconstitutional, we still have some reservations about its effect on plaintiff in this case. In *Spielmaker, supra,* another panel of this Court criticized the effect of the Paternity Act upon putative fathers who wish to establish a relationship with their children. The panel stated:

> It is indeed ironic that, at a time when much criticism is leveled at "deadbeat dads" who fail to assume responsibility for their children and there is a great emphasis placed on the need for fathers to become more involved in the lives of their children, we are faced with a father who wishes to do precisely that yet we are obligated to deny him the opportunity. [205 Mich App 59.]

If defendant and her current husband were to divorce, she would have standing to force plaintiff

to pay child support for his child. *Girard, supra* at 263. Yet, plaintiff is prohibited from establishing a relationship with that child. It is unfortunate that plaintiff could be saddled with the financial responsibilities of raising a child without knowing any of the joys. However, this Court may not repeal a statute on the basis of policy concerns. That is the job of the Legislature. *People v Kirby,* 440 Mich 485, 493-494; 487 NW2d 404 (1992). While we encourage the Legislature to reconsider the effects of this law, we must have a constitutional basis for invalidating a statute. In this case, no such constitutional basis exists.

Defendant may file a bill of costs pursuant to MCR 7.219. Because plaintiff's appeal is not vexatious, defendant is not entitled to attorney fees. *DeWald v Isola (After Remand),* 188 Mich App 697, 700; 470 NW2d 505 (1991).

Affirmed.

R. C. LIVO, J., concurred.

T. G. KAVANAGH, J. *(concurring in part and dissenting in part).* I concur with the majority opinion, except for its treatment of plaintiff's due process rights under the Michigan Constitution. Const 1963, art 1, § 17. While the majority opinion stops short of finding the Paternity Act unconstitutional, it expresses "some reservations about its effect upon plaintiff in this case." *Ante,* at 190. The majority opinion labels these reservations as mere policy concerns; however, I would conclude that such concerns are of constitutional magnitude.

As aptly stated by the majority opinion, the leading case from this jurisdiction is *Girard v Wagenmaker,* 437 Mich 231; 470 NW2d 372 (1991). However, the majority in *Girard* expressly de-

clined to review "any constitutional questions." *Id.*
at 234-235, n 3. In dissent, Justice CAVANAGH,
joined by Justice LEVIN, found that the constitu-
tional issues could not be ignored when interpret-
ing the statute, and adopted the reasoning of the
dissenting opinions of Justice White and Justice
Brennan in the deeply divided cases of *Michael H
v Gerald D,* 491 US 110; 109 S Ct 2333; 105 L Ed
2d 91 (1989), and *Lehr v Robertson,* 463 US 248;
103 S Ct 2985; 77 L Ed 2d 614 (1983). In this case,
I also look to the dissenting opinions in *Michael H*
and *Lehr* for guidance, and would conclude that
the Paternity Act, as interpreted and applied by
the Supreme Court in *Girard, supra,* denies Jamie
Hauser his fundamental right to due process un-
der the Michigan Constitution. However, I cannot
wholeheartedly adopt the analytical framework of
the dissenting opinions in *Michael H* and *Lehr.*

The majority opinion suggests that there are
three approaches for determining whether a puta-
tive father has a protected liberty interest in a
relationship with his biological child: Justice Sca-
lia's approach in *Michael H, supra,* which denied
the putative father standing in order to prevent an
attack upon the traditional "family unit"; Justice
Brennan's dissent in *Michael H, supra,* which
derived the putative father's liberty interest from
the father's biological link with the child, com-
bined with a substantial parent-child relationship;
and Justice White's dissent in *Lehr, supra,* which
stated that a biological link establishes a protected
relationship, and the development of that relation-
ship is relevant to its weight, not its nature. The
majority adopts the approach of Justice Brennan
in *Michael H.* I would take a position between that
of Justice Brennan and Justice White. That is,
while I would not foreclose the possibility of a
protected liberty interest in all cases where there

has not been a previous parent-child relationship, I also conclude that a mere biological link is not sufficient in itself to establish a protected liberty interest.

Under the facts in *Michael H,* the biological father was permitted by the mother to develop a relationship with his child. *Michael H, supra* at 143-144. Indeed, it appears that in *Michael H* a new, functional, family unit was established while the mother, child, and biological father lived together—notwithstanding the mother's continued legal marriage to Gerald D. Emphasizing the biological link and this new family relationship, Justice Brennan concluded that Michael H should prevail on his due process claim.

The facts of this case are distinct from those in *Michael H* in that the putative father here, Jamie Hauser, apparently was precluded by the mother from establishing a parent-child relationship, although he desired and attempted to do so. Thus, while the putative father here apparently was not able to establish a relationship with the child, this should not prejudice his constitutional rights under the facts of this case. This was precisely the situation in *Lehr* that prompted the following statement in Justice White's dissenting opinion:

> We cannot fairly make a judgment based on the quality or substance of a relationship without a complete and developed factual record. This case requires us to assume that Lehr's allegations are true—that but for the actions of the child's mother there would have been the kind of significant relationship that the majority concedes is entitled to the full panoply of procedural due process protections. [463 US 271.]

In such a case where the putative father would have had a significant relationship with the child

but for the actions of the mother, the existence of a parent-child relationship cannot be the ultimate determiner of a protected liberty interest without effectively making the mother the arbiter of the putative father's due process rights. Thus, the peculiar facts of this case demonstrate that while Justice Brennan's approach may be sufficient for defining the liberty interest in some cases, it is potentially underinclusive.

On the other hand, I also find Justice White's approach in *Lehr, supra,* which focuses on the biological link, somewhat unsatisfactory, as demonstrated by the obvious example of the rape case. No one could seriously argue that the perpetrator of a rape has any protected liberty interest in a relationship with the child. Thus, Justice White's approach may be somewhat overinclusive.

While I would concur with many of the statements by Justices Brennan and White in their respective opinions in *Michael H* and *Lehr,* I would not wholeheartedly adopt their analytical framework. Rather, while I agree that a biological link is a necessary prerequisite, I believe that the protected liberty interest in a parent-child relationship derives from the agreement of the two consenting adults, whether explicit or implicit, to share the benefits and assume the responsibilities of entering into a new conjugal, and, ultimately, familial relationship. In this case, it is the agreement of the mother and biological father to establish a novel, independent relationship that has created the putative father's protected liberty interest and concomitant due process rights. Indeed, aside from the blood test evidence, the existence of an agreement to enter into an independent relationship is supported in this case by plaintiff's allegation that both he and defendant had filed for divorce from their respective spouses in further-

ance of the new relationship. I would hold that
once the marriage covenant of fidelity is broken by
an extramarital relationship, the state's interest in
preserving the "unitary family" that Justice Scalia
spoke of is diminished, and the putative father
should at least be afforded the minimal due pro-
cess right of a hearing to determine paternity.

This is *not* to say that the new relationship
would entitle the biological father to any parental
rights; rather, the protected liberty interest would
*only* entitle the putative father to the due process
right of a hearing to determine paternity. Then, if
and when paternity is established, the best inter-
ests of the child would control the extent of any
actual relationship. *Girard, supra* at 272 (CAV-
ANAGH, J., dissenting).

This approach, which focuses upon the disinte-
gration of the legal marriage and the subsequent
formation of an independent familial relationship
between the biological parents, is not an entirely
novel one, but is rather a recapitulation of many
of the statements that have been made by the
various justices in previous cases. For example,
Justice White stated in *Lehr:*

> The "nature of the interest" at stake here is the
> interest that a natural parent has in his or her
> child, one that has long been recognized and ac-
> corded constitutional protection. We have fre-
> quently "stressed the importance of familial bonds,
> whether or not legitimized by marriage, and ac-
> corded them constitutional protection." *Little v
> Streater,* 452 US 1, 13; 68 L Ed 2d 627; 101 S Ct
> 2202 (1981). [*Lehr, supra* at 270.]

Justice Brennan stated in *Michael H:*

> We are not an assimilative, homogeneous soci-
> ety, but a facilitative, pluralistic one, in which we

must be willing to abide someone else's unfamiliar or even repellant practice because the same tolerant impulse protects our own idiosyncracies. Even if we can agree, therefore, that "family" and "parenthood" are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do. In a community such as ours, "liberty" must include the freedom not to conform. The plurality today squashes this freedom by requiring specific approval from history before protecting anything in the name of liberty.

\* \* \*

The evidence is undisputed that Michael, Victoria, and Carole did live together as a family; that is, they shared the same household, Victoria called Michael "Daddy," Michael contributed to Victoria's support, and he is eager to continue his relationship with her. Yet they are not, in the plurality's view, a "unitary family," whereas Gerald, Carole, and Victoria do compose such a family. The only difference between these two sets of relationships, however, is the fact of marriage.

\* \* \*

The plurality's exclusive rather than inclusive definition of the "unitary family" is out of step . . . . This pinched conception of "the family," crucial as it is in rejecting Michael's and Victoria's claims of a liberty interest, is jarring in light of our many cases preventing the States from denying important interests or statuses to those whose situations do not fit the government's narrow view of the family. [*Michael H, supra* at 141-145.]

Further, Justice White stated in *Michael H:*

It may be true that a child conceived in an extramarital relationship would be considered a "bastard" in the literal sense of the word, but whatever stigma remains in today's society is far less compelling in the context of a child of a married mother, especially when there is a father

asserting paternity and seeking a relationship
with his child. It is hardly rare in this world of
divorce and remarriage for a child to live with the
"father" to whom her mother is married, and still
have a relationship with her biological father.

 The State's professed interest in the preserva-
tion of the existing marital unit is a more signifi-
cant concern. To be sure, the intrusion of an
outsider asserting that he is the father of a child
whom the husband believes to be his own would be
disruptive to say the least. On the facts of this
case, however, Gerald was well aware of the liai-
son between Carole and Michael. [*Michael H, su-
pra* at 161-162.]

Additionally, Justice CAVANAGH stated in *Girard:*

It is more than a little hypocritical to contend,
as do the Wagenmakers, that denying standing to
Girard is consistent with "the law's repugnance to
adulterers." The biological mother in this kind of
situation is certainly no less an "adulterer" than
the biological father. It is surely a bit late to talk
of preserving the "sanctity" of the marital family
by the time a situation like the one alleged in this
case has arisen. [*Girard, supra* at 270-271.]

While the various justices have not framed their
due process analyses in terms of the erosion of the
marital covenant and the inception of a mutual
agreement to enter into a new familial relation-
ship, their recitations of facts laden with details
about the new family bonds or family dynamics
reveal that a conscious intention or mutual con-
sent to create a new familial relationship lies at
the heart of the inquiry. In other words, the
details of a new familial relationship are evidence
of a mutual agreement to create such a relation-
ship; but, it is the agreement itself that gives rise
to the putative father's liberty interest. Indeed,
these are the same principles that protect parental

rights within a traditional marriage. The distinction in this case is that the existing marital covenant has been breached, and a new and independent relationship has engendered certain basic rights in the biological father.

While the approach that I would take is consistent with the foregoing dissenting opinions, it is also consistent with our Supreme Court's decision in *Syrkowski v Appleyard,* 420 Mich 367; 362 NW2d 211 (1985). In that case, our Supreme Court granted the biological father standing to bring a paternity claim despite the fact that the child was born to a married woman because the mother and biological father had entered into a surrogate-parenting agreement. While the majority in *Girard* maintained that the holding in *Syrkowski* was limited to the surrogate-parenting context, it nevertheless provides another example of a case where the marital relationship is superseded or modified by a subsequent agreement to create an independent, however nontraditional, familial relationship.

In sum, I would conclude that once the traditional marriage covenant is broken by an extramarital relationship, the state's interest in preserving the unitary family is diminished, and the putative father should be afforded the minimal due process right of a hearing to determine paternity.[1] I would reverse the decision of the trial court.

---

[1] It is noteworthy that the approach that I suggest also makes sense in the rape example. The rapist would have no protected liberty interest in a relationship with the child because there would be no mutual consent or agreement to enter into a new familial relationship.