2013 VT 2

**Bradley Columbia v. Buffy Lawton**

[71 A.3d 1218]

No. 11-151

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed January 18, 2013

166

*Bradley Columbia*, Pro Se, Beattyville, Kentucky, Plaintiff-Appellant.

*James A. Valente* of *Costello Valente & Gentry, P.C.*, Brattleboro, and *Kathryn A.C. Kennedy* of *Kennedy Law, PLLC*, Randolph, in support of Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, *Bridget C. Asay* and *Jody A. Racht*, Assistant Attorneys General, and *Colin Hagan*,

Law Clerk (On the Brief), Montpelier, for Amicus Curiae Office of Attorney General.

■ ¶ 1. **Robinson, J.** This case requires us to consider the constitutional rights of a putative biological father who seeks an order of parentage when a court has already issued a parentage order determining the minor child's parents. We conclude that Vermont's parentage statute does not authorize a court to allow a second parentage action involving a particular child brought by or against a different putative parent unless constitutional considerations require the court to entertain the second parentage case. In this case, even if plaintiff is the genetic parent of the minor child, he does not have constitutionally-protected parental rights. Accordingly, we affirm the trial court's decision denying plaintiff's motion for genetic testing and dismissing his complaint for establishment of parentage.

¶ 2. J.B. was born in July 2008. On July 1, 2010, the Orleans Superior Court, Family Division, entered a parentage order identifying Buffy Lawton and Joshua Bacon as legal parents of J.B. and a second child, born in January 2010. The parentage order was part of an action to establish child support initiated by the Office of Child Support on behalf of mother. The court entered the parentage order based on a stipulation of the parties; the record contains no evidence of any genetic testing or findings to support the order other than the parties' stipulation. However, the associated June 16, 2010 child support order includes a finding that Ms. Lawton and Mr. Bacon were "living together as an intact [f]amily."[1]

¶ 3. Plaintiff Bradley Columbia, representing himself, filed this parentage action against mother in the Orleans Superior Court, Family Division, on August 4, 2010. Plaintiff requested that the court order genetic testing to determine whether plaintiff was the child's biological father. In his sworn affidavit, plaintiff stated that he had a sexual relationship with mother when she became pregnant with J.B., and that she had told him that he was J.B.'s

---

[1] At oral argument, mother represented that Mr. Bacon had signed an acknowledgment of parentage at the hospital when J.B. was born, that she and Mr. Bacon had lived together and co-parented J.B. for several years following J.B.'s birth until several months before the December 2011 oral argument, and that she and Mr. Bacon shared contact with their children, including J.B., on a fifty-fifty basis. We cannot treat these statements as evidence, but do take notice of the findings in the June 2010 child support order.

father. In his affidavit, plaintiff also acknowledged that he did not visit mother and child at the hospital during birth; was not present at the birth of the child; did not offer to pay for an abortion or other medical expenses; was not named on the birth certificate; had not acknowledged his parentage in writing; had not provided food, clothing or financial support for the child; had not lived with the child; had not visited the child; had not sent cards or correspondence to the mother regarding the pregnancy and birth of the child; had not claimed the child on his tax returns; and had not given any gifts to the child. Plaintiff circled "do not know" in response to the question of whether and how the minor child resembled him.

¶ 4. The trial court required plaintiff to join Mr. Bacon as a necessary party before proceeding with the action and, once Mr. Bacon was joined, held a hearing in April 2011. At the hearing, plaintiff reiterated his request for a genetic test. Mr. Bacon took no position on plaintiff's request, and mother said, "I just want this to be over. . . . So whatever will make it be over faster is what I want to happen." At the hearing, mother testified that plaintiff had not had any contact with J.B. Plaintiff testified that he had a sexual relationship with mother at the time she got pregnant; he did not contradict mother's testimony that he had no contact with the minor child, and did not offer any other evidence beyond the possible genetic link to support his claim of parentage.

¶ 5. The family court denied the motion for a genetic test and dismissed plaintiff's case. The court found that "[t]here was no credible evidence presented at the hearing from which this Court could find that it is reasonably likely that the Plaintiff is the natural father of JB," acknowledged the prior parentage order establishing Mr. Bacon's parental status, and noted that plaintiff had had no contact with the minor child. In its conclusions the court stated:

> The Plaintiff does not have standing to proceed with this parentage action. . . . Under [15 V.S.A. §] 302(a) a party does not have standing to proceed with a parentage action in a case where the identity of the child's parent has been previously determined in an action under 15 V.S.A. Section 301 et seq.

The court went on to state that it was "unable to find that there is a reasonable probability that the Plaintiff is the father of the

minor child," and that "it is not in the best interest of the child to require that genetic testing occur." The court thus concluded that good cause existed to exempt the parties and minor child from any obligation to undergo genetic testing. 15 V.S.A. § 304.

¶ 6. Plaintiff timely appealed. In his brief, plaintiff argues that the trial court's rigid interpretation of 15 V.S.A. § 302(a) violates his right to due process as a putative biological father. Mother, also representing herself, did not file a responsive brief.

¶ 7. Amici for plaintiff argued that the parentage adjudication in *Lawton v. Bacon* was conclusive only as to those parties; that the statute should not be construed to require that the winner of a "race to the courthouse" be deemed the legal parent in the face of competing claims; and that the trial court's dismissal of plaintiff's parentage action violated his due process rights under the United States Constitution.

¶ 8. The Attorney General, as amicus, argued that the trial court was correct in concluding that 15 V.S.A. § 302(a) does not permit a second parentage action once a child's parentage has been adjudicated, that the statute is constitutional, and that in the exceptional case in which application of the statutory prohibition against a second parentage action violates a putative parent's constitutional rights, Vermont Rule of Civil Procedure 60(b) provides an avenue for relief.

## I.

¶ 9. The first question we consider on appeal is whether the trial court was correct in concluding that 15 V.S.A. § 302(a), on its face, does not allow a second parentage action when a court has already issued a parentage order. We review this legal question of statutory interpretation de novo. *Chayer v. Ethan Allen, Inc.*, 2008 VT 45, ¶ 9, 183 Vt. 439, 954 A.2d 783. Our review is nondeferential and plenary. *Benson v. MVP Health Plan, Inc.*, 2009 VT 57, ¶ 4, 186 Vt. 97, 978 A.2d 33.

¶ 10. In pertinent part, § 302(a) provides: "An action to establish parentage *in cases where parentage has not been previously determined either by an action under this subchapter or by adoption,* may be brought by . . . a person alleged or alleging himself or herself to be the natural parent of a child . . . ." 15 V.S.A. § 302(a) (emphasis added). "[W]e presume the Legislature intended the plain, ordinary meaning of [the]

statute." *Benson*, 2009 VT 57, ¶ 4 (quotation omitted). The language of § 302(a) is not ambiguous, and expressly limits the court's authority to establish parentage pursuant to subchapter 3A of chapter 5 of Title 15 to cases "where parentage has not been previously determined" in one of the listed ways. Where the language of a statute is clear, our inquiry in construing the statute is "at an end." *LeClair v. Reed ex rel. Reed*, 2007 VT 89, ¶ 5, 182 Vt. 594, 939 A.2d 466 (mem.).

■ ¶ 11. By limiting the availability of a parentage proceeding to cases in which parentage has not previously been established through a separate parentage action or adoption, the Legislature has cast its lot on the side of finality and protection of established parent-child relationships. As we noted in a related context, "Whatever the interests of the presumed father in ascertaining the genetic 'truth' of a child's origins, they remain subsidiary to the interests of the state, the family, and the child in maintaining the continuity, financial support, and psychological security of an established parent-child relationship." *Godin v. Godin*, 168 Vt. 514, 523, 725 A.2d 904, 910 (1998). In *Godin*, this Court considered a case in which, six years after a final divorce decree and associated adjudication of parentage, a father sought to set aside the parentage finding and to disavow parentage of a child born during the marriage and presumed for fourteen years to be his. Pointing to the "fundamental policy concerns that require finality of paternity adjudications," we concluded that the father had failed to establish sufficient "special circumstances" to warrant setting aside the judgment pursuant to V.R.C.P. 60(b). *Id.* at 520-21, 725 A.2d at 908-09. We held that "absent a clear and convincing showing that it would serve the best interests of the child, a prior adjudication of paternity is conclusive." *Id.* at 523-24, 725 A.2d at 910; see also *Lerman v. Lerman*, 148 Vt. 629, 528 A.2d 1121 (1987) (mem.) (determining final adjudication of parentage in divorce order precluded father's subsequent challenge to parentage in context of child support enforcement proceedings because res judicata prohibits relitigation of paternity).

¶ 12. In addition, the Legislature's restriction on multiple parentage actions reduces the risk of conflicting parentage orders involving the same minor child. In a related context, we have rejected an interpretation of the family law statutes that would allow for competing parentage orders involving the same child. In *Jones v. Murphy* we considered a case in which shortly following

their final divorce order mother and ex-husband filed a stipulation to amend the order to reflect that ex-husband was not the biological father of the sixteen-month-old child born during the marriage, and to expressly hold that ex-husband was not a legal parent. 172 Vt. 86, 772 A.2d 502 (2001). The trial court amended the final divorce order to reflect this stipulation, but did so *after* the nisi period ran. Accordingly, the amendment was ineffective and the divorce order assigning parental status to ex-husband remained in effect. *Id.* at 89, 772 A.2d at 504.

¶ 13. In the meantime, mother filed a parentage action against the putative father, who stipulated to his parentage subject to his right to appeal the family court's jurisdiction to entertain a parentage action at all in light of the family court order providing that ex-husband was the legal parent. *Id.* at 87-88, 772 A.2d at 503-04. On appeal in the parentage action, we set aside the trial court's order, explaining that "reversal is compelled not by public interest in the finality of paternity determinations, but by the legal complication occasioned by two conflicting family court determinations, each of which establishes a different obligor-father to support the same child." *Id.* at 91, 772 A.2d at 506. Given the facts of the case — the ex-husband was not seeking to avoid his longstanding obligations or to destroy the child's long-held assumptions, and the biological father's parentage was ready for adjudication — this Court was open to an order holding the putative father to be the minor child's parent. *Id.* at 90, 772 A.2d at 505. But we insisted that the proper route to such a result required first that a party move to set aside the divorce judgment pursuant to Rule 60(b). We rejected the notion that our insistence on a different case flow reflected an emphasis on form over substance, noting that "the effect of the court's decision is to establish two conflicting family court determinations, each of which establishes a different obligor-father to support the same child." *Id.* at 91, 772 A.2d at 506.

¶ 14. One amicus for plaintiff argues that the *Lawton v. Bacon* judgment is not conclusive against plaintiff because plaintiff had no notice of that prior action and did not participate. We do not disagree with amicus's conclusion that res judicata and collateral estoppel do not bar plaintiff's parentage action. However, the impediment to plaintiff's claim in this case does not arise from these doctrines; it arises from the terms of the statute itself. Although considerations favoring finality of judgments may under-

lie both § 302(a) and the judicially-crafted rules regarding collateral attacks on final judgments, these two sources of legal authority are distinct. Nothing in the parentage statute purports to limit the effect of the prohibition of a second parentage judgment concerning the same child to parties who participated in the first proceeding.

¶ 15. Amicus for plaintiff invokes our opinions in *Godin* and *Jones* to support the position that the parentage statute allows a second action involving different parties. In *Godin*, when declining to set aside the parentage judgment in a final divorce order pursuant to a Rule 60(b) motion, we noted in dicta that nothing in our order would "prevent an interested child from later attempting to ascertain the identity of the child's biological father" by filing a parentage action. 168 Vt. at 526, 725 A.2d at 912. Amicus argues that this statement suggests that § 302(a) does not bar parentage actions involving putative parents who were not parties to the prior parentage action.

¶ 16. Section 302(a) expressly bars a new parentage action when parentage of a child has previously been established *in a parentage action or adoption*; the provision is silent about the availability of a parentage action with respect to a child whose parentage has been adjudicated in the context of a divorce action, as in the *Godin* case. As a consequence, in *Godin*, we did not consider the impact of the limitation in § 302(a) on the minor child's possible future initiation of a parentage action. Additionally, although we need not reach the issue here, it is not clear that our remark in *Godin* survives our decision in *Jones*. In *Jones*, we expressly rejected a framework that would allow a *divorce* order adjudicating parentage to stand alongside a separate and inconsistent adjudication in a parentage case, and we insisted on a case flow that ensured that a given child be subject to one and only one court order adjudicating parentage.

¶ 17. Moreover — and, again, we need not decide this question — a child, as opposed to a parent or putative parent, may have independent constitutional protections that require that the child be allowed to pursue an independent parentage action if the child was not a party to the litigation establishing the identity of his or her parents in the first place. See, e.g., *Johnson v. Hunter*, 447 N.W.2d 871, 876 (Minn. 1989) (discussing child's independent constitutional rights concerning establishment and recognition of parent-child relationships, and concluding that child was not bound

by prior dismissal of paternity action and was entitled to pursue parentage action even though such action undermined finality and created potentially inconsistent judgments); *R.B. v. C.S.*, 536 N.W.2d 634 (Minn. Ct. App. 1995) (relying on *Johnson v. Hunter* in holding that where parentage had been previously adjudicated, different putative biological father, who had not made requisite connections with child to establish constitutionally-protected parental rights, could not file parentage action — but child, who was not party to original parentage action, could).

¶ 18. We note that the Uniform Parentage Act (UPA), and states whose parentage statutes follow the UPA, expressly allow for post-adjudication parentage actions in some circumstances. See 9B U.L.A. Parentage Act § 609(b) (2000) ("If a child has an acknowledged father or an adjudicated father, an individual, other than the child, who is neither a signatory to the acknowledgment of paternity nor a party to the adjudication and who seeks an adjudication of paternity of the child must commence a proceeding not later than two years after the effective date of the acknowledgment or adjudication."); see, e.g., Wash. Rev. Code § 26.26.540(2) (same, except requiring commencement of proceedings within four years); Tex. Fam. Code Ann. § 160.609(b) (same). The Vermont Legislature has not included such language in Vermont's parentage law, and we presume it drafted the parentage statute advisedly. *Vt. Human Rights Comm'n v. State*, 2012 VT 45, ¶ 7, 191 Vt. 485, 49 A.3d 149.

¶ 19. For the above reasons, absent a constitutional overlay or exception, we agree that the trial court is not authorized to entertain a parentage action by a putative parent in the face of an existing final judgment of parentage arising from a prior parentage action.

## II.

¶ 20. The next question is whether this statutory bar to plaintiff's parentage action violates his due process rights.

¶ 21. The United States Supreme Court has recognized that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights,' and 'rights far more precious than property rights.'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (alterations omitted)); *Skinner v. Oklahoma*, 316 U.S. 535, 541

(1942); *May v. Anderson*, 345 U.S. 528, 533 (1953)). The rights of a father are not diminished just because the father is not legally married to the mother. *Stanley*, 405 U.S. at 650-51. In *Stanley*, the United States Supreme Court considered the appeal of a father who had lived with the mother of his children intermittently over the course of 18 years. When the mother died, the State of Illinois instituted a dependency proceeding, and the children were declared wards of the state and placed with court-appointed guardians based on a statutory presumption of dependency, without any showing that the father was unfit. The Supreme Court stated that Stanley's interest in retaining custody of his children was "cognizable and substantial," *id.* at 652, and concluded that the State could not terminate his parental rights without a hearing on his fitness to parent. *Id.* at 657-58; see also *In re S.B.L.*, 150 Vt. 294, 303, 553 A.2d 1078, 1084 (1988) ("[T]he right of a parent to custody and the liberty interest of parents and children to relate to one another in the context of the family, free of governmental interference, are basic rights protected by the United States Constitution." (quotation omitted)).

■ ■ ¶ 22. The Supreme Court has also recognized that this due process protection of parental rights does not arise solely by virtue of a genetic connection between parent and child: "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr v. Robertson*, 463 U.S. 248, 260 (1983) (quotation omitted). In *Lehr*, the Court concluded that New York courts did not violate the due process rights of Lehr, a putative biological father, by approving an adoption of the minor child by the mother's husband without notice to Lehr. *Id.* at 265. The Court explained that the constitutionally-protected rights afforded parents are "a counterpart of the responsibilities they have assumed." *Id.* at 257. Examining its own prior cases concerning the rights of unwed fathers, the Court concluded:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection.

*Id.* at 261 (quotations omitted).

 ¶ 23. A biological connection thus creates the *opportunity* to establish a parent-child relationship, but is not, by itself, tantamount to parenthood. As the Court went on to explain:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* at 262. Given that Lehr "never had any significant custodial, personal, or financial relationship" with the minor child, and did not seek to establish a legal tie until after she was two years old, *id.*, the Court concluded that his interests were adequately protected by a statutory scheme that would have provided him notice of the adoption proceedings if he had registered in the "putative father registry." *Id.* at 264-65.

 ¶ 24. Reviewing post-*Lehr* cases, we observed, "most courts and commentators have concluded that the 'opportunity interest' [identified in *Lehr*] must be grasped promptly, both before and after the child's birth, or it will be lost." *In re C.L.*, 2005 VT 34, ¶ 10, 178 Vt. 558, 878 A.2d 207 (mem.). We also noted that "where the biological [parent] is not only unwed, but also for some period of time *unknown*, courts have not hesitated to conclude that the [parent's] ignorance will not excuse a belated failure to act." *Id.* ¶ 11. We cited approvingly a New York Court of Appeals explanation for this seemingly harsh approach: "Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is . . . a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability." *Id.*

¶ 25. In *C.L.*, we upheld the termination of a biological father's parental rights where the trial court did not make an express finding that the father was unfit to parent the child. The father

did not know about the child's existence for nine months after the child's birth, had only had two one-hour visits with the sixteen-month-old and her foster mother prior to the TPR hearing, and was a "virtual stranger to the child, having established no personal or emotional connection with her." *Id.* ¶¶ 5, 17. Upon discovery of his paternity, father had not "[made] every reasonable effort, at the earliest possible date, to seize the opportunity to establish a parental relationship." *Id.* ¶ 16. Although the context of *C.L.* was different, we relied heavily on our analysis of *Lehr* and its progeny "in helping to identify the unique concerns that arise in a case where the State seeks to terminate the parental rights of a recently discovered father whose only link to a child is biological." *Id.* ¶ 15; cf. *In re S.B.L.*, 150 Vt. at 307-08, 553 A.2d at 1087 (biological father of child born out of wedlock, who *also* had requisite relationship with minor child to be treated as "parent," was entitled to presumption as against third parties in guardianship proceeding involving minor child).

¶ 26. Although *Lehr* involved the rights of a putative biological father to challenge an existing adoption order through a parentage action, the Court's constitutional analysis applies with equal force in the context of a challenge to an existing parentage order through a subsequent parentage action. See, e.g., *R.B.*, 536 N.W.2d at 637 (where putative father's claim was based on biology alone, and he had not otherwise shown responsibility for or formed relationship with minor child, his claim did not rise to level of constitutional protection, and he could not bring paternity action in face of existing adjudication). As the Michigan Court of Appeals explained, "It is true that both parents and children have a due process liberty interest in their family life. The protected interest, however, is in the family life, not in the mere biological link between parent and child." *Hauser v. Reilly*, 536 N.W.2d 865, 868 (Mich. Ct. App. 1995) (citation omitted) (putative father could not overcome statutory bar to his standing to bring parentage action on basis of biological link alone).

¶ 27. Applying these considerations to this case, we conclude that, even if plaintiff were found by genetic testing to be the child's biological father, he would not have a constitutionally protected parental interest that trumps the parentage statute's bar against subsequent parentage cases. Like the father in *Lehr*, plaintiff did not seek to establish a legal tie to the minor child

until more than two years after the child's birth. Like the father in *Lehr*, plaintiff "never had any significant custodial, personal, or financial relationship" with the minor child. 463 U.S. at 262. And like the father in *Lehr*, plaintiff had ample opportunity to formally declare and pursue his assertion of parentage through a voluntary acknowledgment of parentage pursuant to 15 V.S.A. § 307, or a parentage action in court pursuant to 15 V.S.A. § 302.

¶ 28. At oral argument, plaintiff represented that he knew that mother was pregnant, possibly with his child, before the minor child was born; that after the child's birth he had written mother from jail requesting photos of the child; and that he had held back from pursuing his parentage claim sooner out of fear for mother's safety. Although these statements are not supported by plaintiff's initial affidavit nor his hearing testimony, and thus are not evidence, these facts would not change our conclusion. If anything, plaintiff's acknowledgment that he knew of mother's pregnancy before the child was born reinforces our conclusion. This is not a case in which a putative parent did not know or have a way of knowing of the existence of the child. Plaintiff's letters to mother asking for photos of the child showed that plaintiff had an interest in the child, but the request for pictures, without accompanying efforts to take responsibility for the child by establishing a relationship, providing nurturing, offering support, or asserting his legal rights was not enough. And plaintiff's explanation for his inaction, while not unreasonable, does not change the fact that when he did step forward, more than two years after the child's birth, he could not claim any indicia of parenthood other than, possibly, a genetic connection to the child.

¶ 29. The determination of an individual's status, or potential status, as a parent requires consideration of a host of factors, including but not limited to a child's genetic connection, or lack thereof, to a putative parent.[2] Future cases may present closer

---

[2] Because father in this case hangs his hat on a potential genetic link to the minor child, our analysis focuses on the insufficiency of such a link, by itself, to trigger the constitutional rights associated with parenthood. We do not mean to suggest that a genetic link is necessary to a claim of parenthood. We have affirmed a trial court's refusal to set aside a divorce order affirming husband's parentage of the minor child presumed to be his for fourteen years, even in the face of a claim that he was not the biological parent. *Godin*, 168 Vt. at 524, 725 A.2d at 911 ("It is thus readily apparent that a parent-child relationship was formed, and it is that relationship, and not the results of a genetic test, that must control."). Likewise,

questions for courts to consider. In this case, given that plaintiff had had no contact or relationship with J.B. — who was nearly three-years old by the time of the trial court's hearing on plaintiff's motion — he did not formally assert or seek to determine his parentage for more than two years after the child's birth, he had not assumed any responsibility for the child's emotional or material well-being, and another legally-adjudicated father had lived in a family relationship with the child, we do not find this to be a close case.

¶ 30. Unless the Legislature adopts the most recent version of the UPA, or otherwise amends the parentage laws to allow a putative parent to seek to establish parentage in the face of an existing parentage order, we recognize that we are left with a situation in which some potential putative parents have a constitutional right to pursue their parentage claims but no clear procedural mechanism for doing so. A party to the initial parentage case can seek to set aside a parentage judgment pursuant to V.R.C.P. 60(b) (applicable in parentage cases through V.R.F.P. 4(a)). See, e.g., *Godin*, 168 Vt. at 520-26, 725 A.2d at 908-12 (addressing motion to set aside divorce judgment determining parentage on its merits); *Jones*, 172 Vt. at 90, 772 A.2d at 505 (requiring mother who filed parentage order against putative father to first move to set aside finding of parentage in divorce order). We realize that this path is arguably not open to someone, like plaintiff, who was not a party to the original action. See V.R.C.P. 60(b) ("On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . ."). But

we affirmed the parentage of a biological mother's same-sex partner in the absence of any biological connection on the basis of a host of other factors, including: (1) the legal union between the biological and nonbiological mother at the time of the child's birth; (2) the partners' "expectation and intent" that both would be the child's parents; (3) the nonbiological mother's participation in the decision that the biological mother would rely upon donor insemination to enable her to bear the child; (4) the nonbiological parent's active participation in the prenatal care and birth; (5) the fact that both partners treated the child as a child of the nonbiological parent during the time they lived together; and (6) the absence of any "other claimant to the status of parent." *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78, ¶ 56, 180 Vt. 441, 912 A.2d 951; see, e.g., *In re Welfare of C.M.G.*, 516 N.W.2d 555, 561 (Minn. Ct. App. 1994) (affirming trial court's order assigning parentage to putative father who signed acknowledgment of parentage, had established bond with child, wanted to continue to parent child, and was willing and able to support child over putative father who was found by blood tests to be child's genetic father but who had no interest in developing relationship with child).

see *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir. 1982) ("Although Rule 60(b)(6) would not ordinarily be available to non-parties to modify final judgments, we hold that on the facts of this case appellants were sufficiently connected and identified with the Secretary's suit to entitle them to standing to invoke [the rule]."); *In re Lawrence*, 293 F.3d 615, 627 n.11 (2d Cir. 2002) ("[S]everal circuit courts have permitted a non-party to bring a Rule 60(b) motion or a direct appeal when its interests are strongly affected, and we have permitted such a motion on at least one occasion."). We need not resolve this question to decide this case, but refer the issue to the Family Court Rules Committee in the hope that the Committee will recommend a course of action to clarify the appropriate procedure.

*Affirmed.*