878 A.2d 207 (2005)
2005 VT 34
In re C.L., Juvenile.
No. 04-362.
Supreme Court of Vermont.
March 15, 2005.
Motion for Reargument Denied April 26, 2005.
*208 Present: REIBER, C.J., DOOLEY, JOHNSON and SKOGLUND, JJ., and ALLEN, Chief Justice (Ret.), Specially Assigned.

ENTRY ORDER
¶ 1. Father appeals from a family court order terminating his parental rights to the minor C.L. He contends the court committed reversible error because the evidence failed to show that either: (1) he was an unfit parent; or (2) granting him custody would be contrary to the child's best interests. We affirm.
¶ 2. C.L. was born on October 31, 2002. The Department of Social and Rehabilitation Services (now known as the Department for Children and Families, or DCF) immediately took custody of C.L. and placed her in a foster home, where she has remained to this day. Mother's oldest child resides with her father. The middle child, T.L., was already in DCF custody at the time of C.L.'s birth as a result of mother's ongoing substance abuse, mental health, and parenting problems. Mother voluntarily relinquished her parental rights to T.L. in January 2003. Her parental rights to C.L. were terminated in July 2003. C.L. was then nine months old.
¶ 3. The identity of C.L.'s father was initially unknown, although one man identified by mother as the putative father had been tested and proven not to be the biological father. K.L. (hereafter "father") testified that he ran into mother around the time of her termination hearing in July 2003, and learned for the first time about C.L.'s existence and that he might be the father. Father had known mother for nearly twenty years. They had been involved romantically many years earlier, for a period of six months to one year, and renewed their sexual relationship in 2002. Father acknowledged that he had contact with mother on two or three occasions after C.L. was conceived, but claimed that she never told him about the pregnancy. After learning about C.L., father contacted DCF, which scheduled a paternity test for September 2003. Father failed to appear for the test (he later claimed not to have received notice), and a second test was scheduled for October. The results showed him to be the biological father.
¶ 4. At a status conference on November 14, 2003, two weeks after the test results, father's attorney informed the court that father had met C.L. and the foster mother, and that there had been some discussion about working things out "so that [C.L.] is free for adoption." Accordingly, counsel suggested continuing the matter for thirty days "to resolve the matter amicably." At the rescheduled conference in December, however, the court learned that father had apparently changed his mind, and now wanted custody of C.L.
*209 ¶ 5. A one-day termination hearing was held in February 2004. C.L. was then almost sixteen months old. As noted, father testified that he was unaware of C.L. for about nine months. Father acknowledged that he had offered no financial or other support to C.L. after learning of the child, but asserted that he had "mentioned" to his lawyer that he was "willing to pay child support." Prior to the hearing, father had two one-hour visits with C.L. and her foster mother. From his observations during these visits, father concluded that the two had "a mother-daughter relationship." He also conceded that C.L.'s foster parents appeared to have taken extremely good care of her, that it would take six months to one year for C.L. to adjust to a change of custody, and that it was not in C.L.'s best interests to separate from the only parents she had ever known. Under further examination by his own attorney, father amended his testimony to claim that a change of custody would be in C.L.'s best interests. Father testified that he was ready and able to assume parental responsibilities. Although he has a lengthy criminal recordincluding convictions of unlawful mischief, disorderly conduct, retail theft, and simple assaultfather claimed to have attained a stable lifestyle; he had recently been given custody of his two young children by his former girlfriend, and owned a taxi service.
¶ 6. The minor's DCF social worker also testified. She stated that the child was thriving in her foster home, was deeply attached to her foster parents and their two older children, whom she viewed as her siblings, and would be emotionally traumatized by a change of custody. The social worker had observed that the foster parents provided a loving home, attended diligently to C.L.'s special medical needs, which included an allergy to all dairy products, and hoped to adopt the child.
¶ 7. At the conclusion of the hearing, the trial court indicated that it wished to hear from an expert concerning the potential impact of a move on a child of C.L.'s age, and the parties agreed to have a court-appointed expert provide such an opinion. A pediatrician specializing in child development submitted a written statement to the court in March 2004. The expert stated that a child of C.L.'s age would have formed a strong attachment to her parents, and opined that a change of custody from the only parents a child has known since birth would put the child at longterm emotional risk and could lead to depression, developmental delay, and disruptive behavior.
¶ 8. The court issued a written decision in July 2004. The court found that father had overcome his past difficulties, was ably parenting two children from another relationship, and had the skills and desire to parent C.L. Nevertheless, the court noted that C.L. was nearly two years old and had virtually no relationship with father or his family; that C.L. was deeply attached to the only parents and siblings she had ever known; and that any change of custody would cause long lasting emotional damage to C.L. resulting from the loss of her family. Applying the statutory factors set forth in 33 V.S.A. § 5540, the court found that C.L. was bonded with her foster family, with whom she had a close, loving relationship; that she was fully adjusted to her home, school, and community; that father had played no role in her life; and that father could not resume parental responsibilities within a reasonable period of time, as any attempted transition would be emotionally devastating to C.L., and the time required for any such change would be unreasonably lengthy measured in terms of the child's needs. Accordingly, the court concluded that termination of father's parental rights was in the best *210 interests of the child, and granted the State's petition. This appeal followed.
¶ 9. Father contends that termination was improper absent an express finding of parental unfitness. The claim raises broader questions concerning the interests of otherwise fit biological fathers who, through ignorance of a child's existence, have established virtually no personal, custodial, emotional, or financial relationship with the child during its early development. The rights of unwed biological fathers have a constitutional as well as a statutory dimension. We have addressed both dimensions in only one modern case, In re S.B.L., 150 Vt. 294, 553 A.2d 1078 (1988), a guardianship contest between the maternal grandparents of a child born out of wedlock and her biological father (the mother had died in an automobile accident). Although we construed the relevant statutory scheme as creating no "preference in favor of the natural father of a child born out of wedlock," id. at 301, 553 A.2d at 1083, we also recognized that the United States Supreme Courtin a series of decisions culminating with Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)had accorded unwed biological fathers certain due process protections under the federal constitution. Lehr involved a New York adoption statute that gave notice of adoption proceedings to unwed biological fathers in certain limited circumstances, including situations where the father was identified on the birth certificate, had lived with the mother and child, or had registered with a "putative father registry." The plaintiff in Lehr qualified under none of these, failed to receive notice of his child's adoption at the age of two, and challenged the statute on due process and equal protection grounds. The high court concluded that due process accorded an unwed biological father only a limited "opportunity" interest. As the Court explained:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection....
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.
463 U.S. at 261-62, 103 S.Ct. 2985 (internal quotation marks and citations omitted). Because the father in Lehr had not participated in the rearing of his child, the Court concluded that he had no cognizable due process interest. As for the equal protection claim, the Court held that a mother and father are similarly situated only if both have "established any custodial, personal, or financial relationship" with the child, and that a father who had "either abandoned or never established" such a relationship was not subject to invidious discrimination. Id. at 267-68, 103 S.Ct. 2985.
¶ 10. Numerous state court decisions since Lehr have explored, in a variety of contexts, the circumstances sufficient to demonstrate that an unwed biological father has grasped the "opportunity" to develop a relationship with his offspring. See generally L. Oren, The Paradox of Unmarried Fathers and the Constitution: Biology "Plus" Defines Relationships; Biology Alone Safeguards the Public Fisc, 11 Wm. & Mary J. Women & L. 47 (2004); D. Meyer, Family Ties: Solving the Constitutional Dilemma of the Faultless Father, *211 41 Ariz. L.Rev. 753, 762-76 (1999); Comment, Who's Your Daddy?: State Adoption Statutes and the Unknown Biological Father, 32 Cap. U.L.Rev. 113, 127-40 (2003). Relying on Lehr's observation that strict compliance with the requirements of the New York putative father registry promoted the state's interest in ensuring "promptness and finality" to the process of finding the child a permanent and stable placement, 463 U.S. at 266, 103 S.Ct. 2985, most courts and commentators have concluded that the "opportunity interest" must be grasped promptly, both before and after the child's birth, or it will be lost. See, e.g., Adoption of Kelsey S., 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, 1236-37 (1992) ("The father's conduct both before and after the child's birth must be considered. Once he knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities ...."); In re Raquel Marie X., 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, 425 (1990) ("[A] father who has promptly taken every available ... [opportunity] to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers...."); In re Baby Boy K., 1996 SD 33, ¶ 43, 546 N.W.2d 86 ("Because children require early and consistent nurturing of their emotional as well as physical needs, an unwed father must act quickly to grasp the opportunity interest in his biological child."); E. Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson, 45 Ohio St. L.J. 313, 364 (1984) ("Th[e] need for early assurance of permanence and stability is an essential factor in the constitutional determination of whether to protect a parent's relationship with his or her child. The basis for constitutional protection is missing if the parent seeking it does not take on the parental responsibilities timely.").
¶ 11. Thus, where the biological father is not only unwed, but also for some period of time unknown, courts have not hesitated to conclude that the father's ignorance will not excuse a belated failure to act. As the New York Court of Appeals has explained:
To conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability.
Robert O. v. Russell K., 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99, 103-04 (1992). Noting that "[n]o one, ... let alone any State actor, prevented petitioner from finding out about [the] pregnancy," the New York court held that the mother's failure to inform the father about the child until it was nearly eighteen months old did not entitle him to invalidate the child's adoption. Id. 590 N.Y.S.2d 37, 604 N.E.2d at 104-05.
¶ 12. Since Lehr, numerous courts have concluded that it is the father's burden to discover the existence of his child, even if he had no notice of the pregnancy or birth, or risk losing the opportunity to transform a biological link into a full and enduring parental relationship. In re S.J.B., 294 Ark. 598, 745 S.W.2d 606, 607 (1988) (although father was unaware of his child, notice of adoption proceeding was not constitutionally required where "biological father was not interested enough in the outcome of his sexual encounter ... to even *212 inquire concerning the possibility of her pregnancy"); In re Zacharia D., 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751, 762-63 (1993) (biological father unaware of paternity until child was fifteen months old was not constitutionally entitled to reunification services); In re Tinya W., 328 Ill.App.3d 405, 262 Ill.Dec. 606, 765 N.E.2d 1214, 1218 (2002) (court properly found father unfit based on failure to provide any financial or emotional support to child despite father's lack of awareness of his paternity); In re Baby Doe, 734 N.E.2d 281 (Ind.Ct.App.2000) (state's interest in child's early permanent placement precluded father from contesting adoption where he was unaware of paternity and failed to timely file with putative father registry).
¶ 13. The rationale of the holdings in these cases is powerfully summarized by the court in In re Baby Boy K., 1996 SD 33, ¶ 53, 546 N.W.2d 86, as follows:
When a putative father is ignorant of his parenthood due to his own fleeting relationship with the mother and her unwillingness to later notify him of her pregnancy, the child should not be made to suffer. The trial court in this case was faced with a child who was unwanted by his mother and unknown to his father.... [Father's] assertion ... that Mother should have told him if he happened to father a child, cannot overcome the State's fully matured interest in protecting the child's permanent home.
¶ 14. To be sure, these decisions arise out of statutory schemes that expressly decline to provide full presumptive parental rights to unwed biological fathers. Vermont's termination-of-parental-rights statute, however, does not fall within this category. It provides, rather, that in deciding whether termination is in the best interests of the child, the court must consider a number of factors affecting the child and the "natural parents," 33 V.S.A. § 5540(1), (3) & (4), thus signaling an intent to accord all biological parents, regardless of gender or marital status, the same significant legal protections. See In re J.B., 167 Vt. 637, 639, 712 A.2d 895, 897 (1998) (mem.) ("Vermont law makes plain that a family court may terminate parental rights only when it finds by clear and convincing evidence that to do so is in the best interests of the child .... "); 33 V.S.A. § 5501(a)(3) (purpose of child protection law is to be achieved "whenever possible, in a family environment, separating the child from his parents only when necessary for his welfare or in the interests of public safety").
¶ 15. Lehr and its progeny are instructive, nevertheless, in helping to identify the unique concerns that arise in a case where the State seeks to terminate the parental rights of a recently discovered father whose only link to a child is biological. For regardless of the nature of the statutory scheme or the father's legal rights, the facts in such a case are manifestly unlike those whereas often happensa state agency has taken custody of a child from birth and placed it in a foster home, while simultaneously working with the natural parents toward reunification. There, the efforts of the parentsunder state auspicesto achieve a custodial, emotional, and financial relationship with the child stand in sharp contrast to those of a father who has made virtually no such effort, and whose absence is the result not of any action by the State, or misrepresentation by the mother, but simply his own indifference. As the record here makes clear, this is not a case where an isolated sexual encounter made it highly unrealistic to expect that father could have reasonably discovered his paternity. The evidence showed that father had known mother for many years, had been previously involved with her romantically, and had met her on several occasions after their renewed sexual *213 relationship. There was no evidence that mother had willfully concealed or misrepresented father's paternity. There is no reason to believe, therefore, that even a minimal level of interest would not have alerted father to the fact of mother's pregnancy and the possibility that he was the father.
¶ 16. Nor is this a case where a previously unknown fatherupon discovery of his paternitymakes every reasonable effort, at the earliest possible date, to seize the opportunity to establish a parental relationship. Father missed his initial paternity test, expressed an initial interest in voluntarily relinquishing his parental rights, and delayed for two months after discovering his paternity to assert any custodial rights. For a child in these circumstances, any delay is critical. See In re Zacharia D., 24 Cal.Rptr.2d 751, 862 P.2d at 763 (although child in normal circumstances may not be irrevocably harmed where father waits for months to inquire into existence of children that may have resulted from sexual encounter, "a child in the dependency system requires a more time-critical response").
¶ 17. Considered against this legal and factual backdrop, father's claim that the trial court erred in terminating his parental rights absent a specific finding of parental unfitness is unpersuasive. Although the trial court found that father was ably parenting two children from another relationship, and possessed the skills to parent C.L., it observed, correctly, that the paramount concern was father's ability to resume his parental responsibilities for C.L. within a reasonable period of time, measured from the perspective of the child's needs. See In re A.D.T., 174 Vt. 369, 376, 817 A.2d 20, 26 (2002) (parent's ability to resume parental responsibilities within reasonable time is most important of statutory factors governing termination of parental rights); In re B.S., 166 Vt. 345, 353, 693 A.2d 716, 721 (1997) (reasonableness of time period for resuming parental responsibilities "must be viewed from the perspective of the needs of the child"). While acknowledging that the result was regrettable, the court found that father could not assume parental responsibilities for C.L. within a reasonable period of time, in view of the fact that he was a virtual stranger to the child, having established no personal or emotional connection with her; that C.L.'s foster parents and their two other children were literally the only family C.L. had ever known; and that any attempted transition of custody to father would require an unreasonably lengthy period of time measured from the child's perspective, and would cause lasting emotional damage to the child from the perceived loss of her family.
¶ 18. Contrary to father's assertion, the court's ruling was not, in any sense, an unfair and disfavored comparison between the child's psychological attachment to her biological and foster parents. Cf. In re E.B., 158 Vt. 8, 12, 603 A.2d 373, 376 (1992) (parental rights cannot be terminated "simply because a child might be better off in another home"); In re J. & J.W., 134 Vt. 480, 484, 365 A.2d 521, 524 (1976) (termination must be based on more than simply the "loss of the psychological parent relationship between natural parent and child"). As we said in In re B.M., 165 Vt. 331, 342, 682 A.2d 477, 483 (1996), "[t]his is not a case in which the State disrupted a parent-child relationship by removing the child from the home, and then argued that the subsequent weakening of the parent-child bond should be grounds for termination." There was no forcible removal here, and father and child had never developed any relationship that could be disrupted.
¶ 19. In these circumstances, therefore, we discern no error in the court's failure to render a specific finding that father was *214 unfit to parent C.L. The trial court's focus was properly on the future of the parent-child relationship, and its finding that father could not resume his parental role within a reasonable period of time, measured from the perspective of the child's needs, was amply supported. See In re E.B., 158 Vt. at 13, 603 A.2d at 376-77 (court did not err in failing to make specific finding of parental unfitness where findings "clearly indicate[d]" that parents were incapable of resuming parental responsibilities within a reasonable period of time).
¶ 20. Father also contends the evidence was insufficient to support the court's finding that a change of custody would cause lasting emotional damage to C.L. He grounds the claim on the fact there was no psychological evaluation of C.L. herself, only the expert's written statement concerning the effect generally of such a change. While father is correct that the focus of the court's inquiry must be on the individual child in question, we do not agree that a psychological evaluation was absolutely necessary to support the court's finding. The social worker's observation of C.L.'s deep emotional attachment to her foster family and conclusion, based on her experience, that a change would traumatize C.L., coupled with the expert's opinion that such a change has generally been found to be emotionally scarring, was sufficient to support the finding. See In re B.M., 165 Vt. 194, 201, 679 A.2d 891, 896 (1996) (family court's findings will be upheld if supported by credible evidence). Accordingly, we discern no basis to disturb the court's finding, or its decision that termination was in the best interests of the child.
Affirmed.