*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2016-068

JUNE TERM, 2016

| | |
|---|---|
| In re A.M., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Windham Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 2-1-14 Wmjv |

Trial Judge: Karen R. Carroll

In the above-entitled cause, the Clerk will enter:

Father appeals an order of the superior court, family division, terminating his parental rights with respect to his daughter, A.M. We affirm.

The record reveals the following unchallenged facts. A.M. was born in May 2011. Father had a brief relationship with A.M.'s mother in 2010 after spending a significant portion of his life incarcerated. Father and mother were not together at the time of A.M.'s birth, but father was aware in 2011 that mother was pregnant with his child. Father first met A.M. on a July 2013 visit to Vermont from New York City, where he was living. Following the visit, father drove mother and A.M. back to New York for the weekend, but had little contact with mother or A.M. thereafter.

In January 2014, the Department for Children and Families (DCF) filed a petition alleging that A.M. was a child in need of care or supervision (CHINS) due to mother's substance abuse, unstable housing, and inability to provide for A.M.'s needs. The family court issued a conditional custody order (CCO) placing A.M. with her maternal grandmother, who had been actively involved in the child's care up until that time. Following a contested merits hearing in March 2014, A.M. was adjudicated CHINS. The court maintained custody with A.M.'s grandmother under the CCO following an April 2014 hearing wherein a disposition report indicated that the paternity of the child needed to be established because father's whereabouts were unknown.

In October 2014, father visited A.M. for the second time since her birth after grandmother contacted him on Facebook. During the visit, father told grandmother that he was aware of DCF's involvement with A.M. and that he did not want custody of the child but wanted to be part of her life. Over the next several months, he visited A.M. on three or four occasions at the grandmother's invitation, the last visit being in June 2015.

Meanwhile, DCF made contact with father in early 2015. In February 2015, the family court granted DCF's request to order father to undergo genetic testing to establish paternity. Father's paternity was established in May 2015 based on his agreement and the results of the genetic testing. Father did not have in-person contact with A.M. after June 2015, despite DCF's

efforts at scheduling visits. A DCF caseworker met twice with father, the second time in June 2015, to go over the case plan and to explain DCF's expectations of what he needed to do pursuant to the case plan. The case plan required father, among other things, to undergo substance-abuse and mental-health evaluations and to have regular contact with A.M. Father never underwent the substance-abuse and mental-health evaluations.

On May 1, 2015, two weeks before father's paternity was established, A.M.'s attorney filed a petition to terminate mother and father's parental rights. Mother's parental rights were terminated on June 3, 2015. Following a separate hearing held over two days in October and November 2015, the court terminated father's parental rights. Father appeals the termination order, arguing that: (1) the court's conclusions that his progress had stagnated[1] and that he would not be able to resume parental rights within a reasonable period of time were premised on a finding unsupported by the record; and (2) the court abused its discretion by not allowing him to present evidence regarding grandmother's substance abuse.

Father first argues that because the boilerplate case plan requirement that he undergo substance-abuse and mental-health evaluations was not in response to any identified concerns about him, his failure to undergo the evaluations cannot be a basis for the court's conclusion that he would be unable to resume parental duties within a reasonable period of time.[2] He further argues that, regarding the requirement that he have regular contact with A.M., there was no evidence to support the court's finding that his telephone contact with A.M. "dwindled to none" or that he no longer had a relationship with A.M. Thus, according to father, these findings cannot support the court's conclusion that he will be unable to resume his parental duties within a reasonable period of time.

Addressing the second argument first, we conclude that the evidence amply supports the court's findings that father had never developed a meaningful relationship with A.M. and that his contact with the child diminished over time. While recognizing that father's few visits with A.M. had gone well and that he displayed affection for her, the court found that father had never played a significant role in her life. As the court found, although father was aware that A.M. was his daughter since her birth in 2011 and had concerns about mother's drug use when he visited the child in 2013, he made no attempt to establish his paternity in court or to maintain a relationship with the child. Moreover, after he became aware in the fall of 2014 that DCF was involved with A.M., he visited A.M. on only a few occasions despite DCF's efforts to establish more regular visitation. Although father's telephone calls may not have "dwindled to none," the testimony from father supports the finding that he stopped making regular phone calls within two

---

[1] The family court went through the two-step process of determining whether there were changed circumstances and whether A.M.'s best interests warranted terminating father's parental rights; however, because the termination hearing was an initial disposition hearing, the court did not need to make a threshold finding of changed circumstances. See In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29. Father does not claim error on this basis, and in fact the error was harmless because the family court still had to conclude that the statutory best-interest factors warranted termination of father's parental rights. See 33 V.S.A. § 5114(a).

[2] A DCF caseworker testified at the termination hearing that because DCF did not know father when it prepared its case plan, it listed services it would expect of any unknown father. Once father was identified, he acknowledged his criminal convictions, as well as pending charges related to drug possession.

2

weeks after a telephone contact arrangement was initiated. The overwhelming evidence demonstrates that father played virtually no role in A.M.'s life.

This Court has recognized "the unique concerns that arise in a case where the State seeks to terminate the parental rights of a recently discovered father whose only link to a child is biological." In re C.L., 2005 VT 34, ¶ 15, 178 Vt. 558. In C.L., as in the instant case, the father was aware of his paternity but made little effort to establish a parental relationship. Under such circumstances, we rejected the "father's claim that the trial court erred in terminating his parental rights absent a specific finding of parental unfitness" because "the paramount concern was [the] father's ability to resume his parental rights within a reasonable period of time, measured from the perspective of the child's needs." Id. ¶ 17. We affirmed termination of the father's parental rights in that case because the father had not established an emotional connection to the child, the child's foster parents were the only family the child had ever known, and any attempt to transition custody to the father "would require an unreasonably lengthy period of time measured from the child's perspective, and would cause lasting emotional damage to the child from the perceived loss of her family." Id.

The situation here is similar. The evidence supports the court's finding that father has never made a sincere attempt to parent A.M., despite DCF's good faith efforts to schedule time for him to develop a relationship with her. The court further found that A.M. had a strong attachment to her grandmother, who had taken care of her for most of her young life, and that father had never played a constructive role in her life. We conclude that the record supports the court's determination that father would be unable to assume parental duties within a reasonable period of time from the perspective of A.M.

As for father's argument that his failure to undergo substance-abuse and mental-health evaluations cannot be the basis for the court's conclusion that he would be unable to resume his parental duties within a reasonable period of time, that conclusion was not based, to any significant degree, on father's failure to undergo the evaluations. Rather, the court based the conclusion on father's inability to parent A.M. safely, and his failure to maintain contact with the child and engage in a case plan aimed at helping him reach the point where he could parent her in the future.

Father also argues that the court abused its discretion by not allowing him to present evidence of the grandmother's past drug use, which may have affected its decision. We find no abuse of discretion. See Follo v. Florindo, 2009 VT 11, ¶ 19, 185 Vt. 390 (stating that "trial court's rulings on admission or exclusion of evidence are discretionary" and that its ruling will not be disturbed unless its discretion was abused or entirely withheld, resulting in prejudice to substantial rights). On May 22, 2015, following a status conference, the court ordered the State to file its proposed witness and exhibit list by June 19, 2015 and all other parties, including father, by July 24, 2015. DCF and the juvenile filed their witness and exhibit list on June 1, 2015, and on July 27, 2015 father disclosed four witnesses and no exhibits. On October 29, 2015, more than three months after the discovery deadline and three weeks after the first day of the termination hearing, father filed an updated witness and exhibit list that included grandmother's criminal records from 1993 to 2007. The State objected to the amended list, and father responded, stating that the reason for the late disclosure was that he initially supported the grandmother retaining custody of A.M. but changed his mind after the first day of the termination hearing. The court denied the motion, noting that father's amended list was offered more than three months after the discovery deadline, even though father had been on notice from the beginning that DCF was recommending transfer of custody to the grandmother. The court

3

further noted that at the close of the first day of the termination hearing, father's counsel represented to the court that only father was left to call as a witness. The court later denied father's motion for reconsideration, stating that father always knew what was being proposed and had been given a full and fair opportunity to demonstrate his ability to parent A.M.

On appeal, father claims that evidence of the grandmother's criminal history is essential to the family court's consideration of her suitability as a caretaker for A.M. He contends that the family court abused its discretion by not allowing the evidence, given the nature of the interests at stake. Father has made no proffer on appeal to demonstrate how the requested exhibits were likely to impact the court's termination decision, and it is unclear how records from no later than 2007 would be significant in this case. The court made numerous findings, none of which father has challenged on appeal, regarding the grandmother's suitability as a caretaker and A.M.'s progress in her care. The court found that the grandmother was present at A.M.'s birth and frequently took care of her prior to DCF involvement. The court further found that the grandmother had a suitable residence for her and A.M., that she focused all of her time and energy on A.M. because she did not work outside the home, and that she takes care of A.M.'s medical, educational, and other needs. Moreover, the court found that A.M. had a "strong attachment" to her grandmother, who is the "most important person" in her life, and that the relationship was "positive and ongoing." Finally, the court found that "[a] disruption of this relationship would likely be very detrimental to [A.M.]." Given the apparent limited relevance of the proffered exhibits, we find no basis to overturn the family court's discretionary decision not to admit them.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice