NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 69

No. 2019-099

In re M.P., Juvenile

Supreme Court

On Appeal from
Superior Court, Windham Unit,
Family Division

August Term, 2019

Katherine A. Hayes, J.

Matthew Valerio, Defender General, Montpelier, and Sarah R. Star, Attorney & Counselor at
  Law, P.C., Middlebury, for Appellant Father.

Adele V. Pastor, Barnard, for Appellant Mother.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Jody A. Racht, Assistant Attorney
  General, Waterbury, for Appellee Department for Children and Families.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Dooley, J. (Ret.),
          Specially Assigned

¶ 1. **REIBER, C.J.** Mother and father appeal termination of their parental rights to their daughter M.P., born in October 2015. On appeal, father[1] argues that (1) Vermont lacked subject matter jurisdiction to adjudicate M.P. as a child in need of care or supervision (CHINS) and to terminate his parental rights under the Uniform Child Custody Jurisdiction and Enforcement

---

[1] As explained in more detail below, the man married to mother and identified as a parent at the time of M.P.'s birth was later determined not to be M.P.'s biological or legal parent. He is referred to as "husband" in this opinion. This opinion uses "father" to refer to mother's paramour, W.H., whom the court later adjudicated as M.P.'s legal father in a parentage order.

Act (UCCJEA); (2) the family court erred in finding that his progress had stagnated and that termination was in M.P.'s best interests; and (3) the evidence does not support the court's finding that the Department for Children and Families (DCF) made reasonable efforts to finalize the permanency plan. Mother joins father's arguments and argues that the CHINS order is invalid because mother did not join the stipulation on which the order was based. We affirm termination of mother's rights and reverse and remand the order terminating father's parental rights.

¶ 2. In sum, we reject parents' jurisdictional challenges to the CHINS merits order and reverse termination of father's parental rights. We conclude that husband had authority as the children's custodian and presumed legal parent to enter the stipulation upon which the CHINS decision was based. Further, the family court had temporary emergency jurisdiction over the CHINS petition under the UCCJEA and that jurisdiction became permanent when no case concerning M.P. was filed or commenced in another state. We affirm termination of mother's parental rights. We conclude that the court erred in finding that father's progress had stagnated. Nonetheless, we hold that there was a change of circumstances warranting modification of the case plan in this case given the identification of father, who had previously been involved as M.P.'s caretaker, as M.P.'s legal parent. We reverse termination of father's rights and remand.

¶ 3. The court found the following facts. When M.P. was born, mother was married to husband. Husband was present at M.P.'s birth, and his name was placed on M.P.'s birth certificate. Mother and husband also have two older children together. At the time of M.P.'s birth, the family lived in Alabama. In the spring of 2016, the family moved to Vermont. Mother was subsequently arrested on an Alabama warrant and extradited to Alabama. M.P. and her brothers remained in Vermont in husband's care. In August 2016, husband requested assistance in caring for the children, and M.P. and her brothers were placed in DCF custody. The State filed a petition alleging M.P. and her brothers were CHINS.

¶ 4.     In September 2016, M.P. was placed in a foster home where she has since remained. At the time, M.P. was just under one year old and very small for her age. She was unable to sit up and could not grasp objects or feed herself. Her foster mother worked with her, a doctor, and an interventionist, and by the time of the termination hearing, at three years old, she was on track developmentally and doing very well. She has a close, loving relationship with her foster parents and foster brother and sees her two half-brothers regularly. Her foster parents would like to adopt her.

¶ 5.     In November 2016, husband as custodial parent, the children, the State, and DCF entered into a merits agreement, and the court found based on the stipulated facts that M.P. and her brothers were CHINS. The court issued a disposition order in January 2017 covering all three children, which had concurrent case plan goals of reunification with one parent "by August 2017" or adoption. Mother's plan of services required her to, among other things, participate in a substance-abuse evaluation, attend treatment if recommended, maintain consistent communication with the children, refrain from criminal activity, secure safe and stable housing, sign releases, obtain employment, and participate in a mental-health assessment. The disposition case plan stated that mother had named as M.P.'s father her paramour, W.H., with whom she had been living. In March 2017, at a post-disposition review hearing, the court issued an order for genetic testing to determine if husband was M.P.'s biological parent. Based on the results of the genetic testing and the absence of objection from husband, in June 2017, the court issued a proposed parentage order naming W.H. as M.P.'s legal parent. W.H., referred to throughout this decision as father, was entered as a party in the case and assigned an attorney.

¶ 6.     Husband subsequently moved to vacate the parentage order. In October 2017, the court denied the motion, concluding that husband knew there was a possibility he was not M.P.'s biological parent and that during a period after M.P.'s birth, mother and father lived together and jointly cared for M.P. This order was not appealed.

3

¶ 7.     With parentage for M.P. established, DCF filed a new case plan with a plan of services for father but the court did not issue a new disposition order adopting the case plan at that time.  Under that plan of services, father was to, among other things, demonstrate safe and appropriate parenting, attend court hearings and appointments, remain in contact with DCF, secure safe and stable housing and childcare, and maintain employment or means of financial support.  A permanency hearing was held in December 2017.  The court found that the permanency plan from July 2017 was outdated and rescheduled the hearing.  DCF filed a new plan in February 2018, which had a goal of termination of parental rights.  The State filed petitions to terminate parents' rights at the same time.

¶ 8.     Mother cared for M.P. during the first several months of her life.  She is an Alabama native and spent some time living with husband and some time living with father and his family.  When M.P. was between two and eight months old, mother lived with father full-time while husband was incarcerated.  Father did not know mother was taking M.P. to Vermont until after the move and he did not learn that M.P. was in DCF custody until about a week after the emergency care order issued.  Father attempted to communicate with DCF, but DCF would not provide him with information because he was not recognized as M.P.'s legal parent at the time and was not a party to the proceeding.  Mother was incarcerated when M.P. came into DCF custody.  She was reincarcerated at least twice after being released.  Mother was not able to visit M.P. from the time M.P. was placed in DCF custody in August 2016 until the post-disposition hearing in March 2017.  Although mother was released from custody for part of that time, she had a medical condition that limited her ability to travel to Vermont.  Mother was again arrested in March 2018 in Alabama and remained incarcerated at the time the termination hearing began in August 2018.  Mother provided a urine sample for drug analysis in December 2018, which was positive for amphetamine, methamphetamine, benzodiazepines, and opiates.  Mother claimed these were prescribed substances but did not provide a physician's name or releases to support that assertion.

4

¶ 9.     Father lives in Alabama.  He was no longer in a relationship with mother at the time of the termination hearing.  He receives Social Security Disability payments and does side jobs. He attended parenting classes and does not have significant mental-health issues or a history of substance abuse.  DCF submitted an Interstate Compact on Placement of Children (ICPC) request to Alabama asking them to assess the appropriateness of father's home to place M.P.  This referral was not complete by the time of the termination hearing.  Father's sister had contact with M.P. during her early life.  She offered herself and her family as guardians for M.P.  She took classes to qualify as a foster placement and in June 2018 was certified by Alabama as an approved foster parent.  In May 2018, DCF informed her that it had determined it was in M.P.'s interest to remain with her foster parents and not move to Alabama.  In July 2018, DCF received notice that Alabama had approved an ICPC request for aunt's home.

¶ 10.    Mother and father came to Vermont for visits with M.P. during the summer of 2017. Father's sister provided transportation and was present for visits in August and September 2017. Overall the visits went well, but mother and father tended to crowd M.P. and M.P. was more engaged with father than mother.

¶ 11.    Based on these findings, the court determined that there had been a change of circumstances due to parents' stagnation.  Mother had failed to meet several key requirements, including avoiding criminal activity and incarceration.  Mother's charges had connections to illegal drug use, and she had not addressed her substance-abuse problem.  Because of her incarceration, mother was unable to maintain contact with M.P., develop a bond with her, or demonstrate a consistent, safe, and appropriate living environment.  Father's interaction with M.P. was not regular or consistent enough to enable M.P. to form an attachment with father or for him to develop a parental relationship with his daughter.  The court further found that termination of mother's and father's rights was in M.P.'s best interests.  M.P. has a strong and loving bond with her foster parents and siblings but little relationship with either biological parent.  Mother and father were

5

not able to parent M.P. within a reasonable period of time as measured from M.P.'s perspective. They did not play a significant role in her life, and she was not bonded to them. The court denied aunt's requests to have M.P. placed with her or to be M.P.'s guardian, finding that aunt did not have a significant relationship with M.P. Mother and father separately appeal the termination order.

## I. Stipulation and CHINS Order

¶ 12. On appeal, parents both challenge the validity of the CHINS merits decision. Father argues that the family court committed plain error in proceeding to disposition and then termination because mother's husband, although the putative father and custodial parent at the time, lacked authority to stipulate that M.P. was CHINS. Father contends that this error deprived the family court of jurisdiction over M.P., negating the succeeding disposition and termination decisions. Mother argues that the CHINS order was invalid because it was based on a stipulation that she did not join and was not entered by a custodial parent. Because these arguments are being raised for the first time on appeal, they were not properly preserved for our review. In re D.C., 157 Vt. 659, 660, 613 A.2d 191, 191 (1991) (mem.) ("Issues, including those with constitutional dimensions, are waived by parties unless raised at the earliest opportunity.").

¶ 13. Even if properly preserved, or even if we applied plain error review, we would reject these arguments on the merits. There is no merit to father's assertion that because he was not a party at the time that M.P. was declared CHINS, the finding should not bind him and could not form the basis for a later termination petition. As we have explained in the past, the focus of a CHINS merits proceeding is the child's welfare and not the respective unfitness of the parents. In re B.R., 2014 VT 37, ¶¶ 13-14, 196 Vt. 304, 97 A.3d 867.

¶ 14. Here, the CHINS merits decision was based on husband's stipulation that he was unable to care for M.P. Mother contends that because husband was ultimately found not to be M.P.'s biological parent, he lacked authority to enter a stipulation. Pursuant to statute, the family

6

court can approve a written stipulation if it is agreed to by the parties. 33 V.S.A. § 5315a(b)(1). Party is defined to include "the custodial parent, the guardian, or the custodian of the child in all instances except a hearing on the merits of a delinquency petition." Id. § 5102(22)(B). Mother claims that husband was neither a custodial parent nor a guardian and under the statute could not legally stipulate as merely the children's custodian.

¶ 15.    We conclude that husband had authority under the statute to stipulate that M.P. was CHINS. At the time husband entered the merits stipulation, he was M.P.'s custodian. In addition, he was the presumptive legal parent of M.P. by virtue of his marriage to mother at the time of M.P.'s birth. 15 V.S.A. § 308(4) (providing that person is presumed to be parent if child is born while husband and wife "are legally married to each other").[2] The family court had no reason to question that husband's status as M.P.'s custodian and M.P.'s custodial parent.[3] As the custodian and custodial parent, his stipulation was valid.

¶ 16.    There is no merit to mother's argument that she was a custodial parent and was not bound by a stipulation that she did not join. The statute defines custodial parent as "a parent who, at the time of the commencement of the juvenile proceeding, has the right and responsibility to provide the routine daily care and control of the child." 33 V.S.A. § 5102(7). At the time that the CHINS proceeding was initiated mother was incarcerated in Alabama and did not have the right or responsibility over M.P.'s routine daily care or control. Therefore, she was a noncustodial parent and it was not necessary for her to join the merits stipulation.

---

[2]  This statute was in effect at the time and has since been repealed. 2017, No. 162 (Adj. Sess.), § 2. The current statute contains the same presumption. 15C V.S.A. § 401(a)(1).

[3]  For this reason, there is no merit to father's argument that the court was required to resolve M.P.'s paternity prior to proceeding to disposition.

¶ 17.    The parties also challenge the court's jurisdiction over the CHINS proceeding under the UCCJEA, 15 V.S.A. §§ 1061-1096.  The purpose of the UCCJEA is "to avoid a jurisdictional contest between states." Pierce v. Slate, 2017 VT 63, ¶ 13, 205 Vt. 159, 172 A.3d 190.  To achieve this end, the UCCJEA delineates the circumstances in which Vermont has jurisdiction to make custody determinations.  "The primary basis for exercising jurisdiction is when Vermont is the home state of the child at the time the proceeding is commenced." In re M.S., 2017 VT 80, ¶ 6, 205 Vt. 429, 176 A.3d 1124; see 15 V.S.A. § 1071(a)(1).

¶ 18.    Father asserts that at the time that M.P. was taken into custody M.P. had been in Vermont for only three months and therefore Vermont was not her home state and the family court lacked jurisdiction to issue the CHINS merits order under the UCCJEA.  This argument was not raised below, and the merits and disposition order were not appealed on this basis.

¶ 19.    We do not, however, need to reach the question of whether the lack of preservation and failure to appeal the orders precludes parents from raising the issue at this stage in the proceedings.  We conclude that the court had authority to act under UCCJEA.  The UCCJEA provides the bases for a Vermont court to make an initial custody order, have continuing jurisdiction, modify an existing order, and exercise temporary jurisdiction.  See 15 V.S.A. §§ 1071-1074.  Many of the bases are fact-dependent and because no party raised the issue below, we acknowledge that we do not have findings from the court.  Nonetheless, we can resolve the issue because the relevant facts are part of the record and undisputed.

¶ 20.    As to the court's jurisdiction over M.P. when the CHINS petition was filed, the record indicates that the court had temporary emergency jurisdiction over M.P.  Vermont can exercise temporary emergency jurisdiction under the UCCJEA "if the child is present in Vermont, and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or

abuse." See id. § 1074(a). It is undisputed that at the time the State filed the CHINS petition, M.P. was living in Vermont with husband, her presumptive father, that mother was incarcerated in Alabama, that husband was unable to care for M.P., and that state intervention was required to protect M.P. from harm or risk of harm. Therefore, the undisputed facts demonstrate that the court had temporary emergency jurisdiction.

¶ 21. Under the UCCJEA emergency-jurisdiction provision, once a court exercises temporary emergency jurisdiction, if no child-custody proceeding is commenced in a court of a state having jurisdiction, then the Vermont determination becomes final "and Vermont becomes the home state of the child." Id. § 1074(b). Other states have interpreted this provision to provide that once a child, over whom a state has exercised emergency jurisdiction, has remained in the state for more than six months and no custody order or proceeding has been initiated or is pending, the emergency state becomes the child's home state. See In re E.X.J. 662 S.E.2d 24, 29 (N.C. Ct. App. 2008) (explaining that North Carolina, which had issued a temporary order, became child's home state when after six months no custody orders were entered in any other state). "The UCCJEA does not require a trial court who has assumed temporary jurisdiction to return custody to a parent where there is no competing custody order." Davis v. Arkansas Dep't of Health & Human Servs., 254 S.W.3d 762, 767 (Ark. Ct. App. 2007) (holding that after court exercised emergency jurisdiction and no other state had proceeding pending, Arkansas became children's home state); see In re T.F., No. D052373, 2008 WL 2917534, *5 (Cal. Ct. App. July 30, 2008) (explaining that after California exercised emergency jurisdiction over child and there were no pending proceedings in other states "the UCCJEA did not restrict the court's power to proceed").

¶ 22. Here, Vermont became M.P.'s home state. There is no evidence that there was a previous child-custody determination regarding M.P. or that a child-custody proceeding was commenced or pending at the time the CHINS merits order issued or for six months following that, or even by the time the termination petition was filed and the hearing held. Given the lack of a

9

competing custody order or proceeding in another state, Vermont's exercise of temporary emergency jurisdiction became final, and Vermont became M.P.'s home state. Therefore, the court had jurisdiction to enter permanent custody orders concerning M.P.

### III. Termination of Father's Rights

¶ 23.   Father raises several arguments concerning the family court's determinations that there was a change of circumstances because father's progress had stagnated, and that termination was in M.P.'s best interests. Father argues that the court found stagnation and terminated his parental rights because he was financially unable to move to Vermont and therefore was unable to establish a significant-enough relationship with M.P. He also argues that the court violated his rights to substantive and procedural due process and equal protection in terminating his parental rights without evidence of unfitness.

¶ 24.   When termination of parental rights is sought after initial disposition, the family court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291, 648 A.2d 652, 654 (1994). The court must first find that there has been a change in circumstances; second, the court must find that termination of parental rights is in the child's best interests. See 33 V.S.A. § 5113(b) ("Upon motion of a party or the Court's own motion, the Court may amend, modify, set aside, or vacate an order on the grounds that a change in circumstances requires such action to serve the best interests of the child."); id. § 5318(d) ("A disposition order is a final order which may only be modified based on the stipulation of the parties or pursuant to a motion to modify brought under section 5113 of this title."). A change of circumstances is often demonstrated by showing that a parent's ability to care for a child has stagnated; in other words, despite the passage of time, there is "no improvement in parental capacity to care properly for the child." In re B.W., 162 Vt. at 291, 648 A.2d at 655 (quotation omitted).

¶ 25.   The circumstances in this case are unusual and do not fit well into the construct for evaluating whether there was a change of circumstances due to father's stagnation. Stagnation is

10

usually measured by a parent's progress towards achieving the case-plan goals. "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639, 852 A.2d 588 (mem.). Here, these benchmarks are inapplicable. Because M.P. was removed from Alabama without father's knowledge and M.P. was not in his care at the time she was taken into custody, his actions did not directly contribute to M.P. being adjudicated CHINS and taken into state custody. Moreover, father was not a party at the time the existing disposition order was adopted and therefore there was no plan of services related to him. Father was not a party in January 2017 when the initial disposition was entered, which had concurrent goals of reunification with a parent and adoption. Because father was not recognized a legal parent at that time, he was not included in the plan or provided services to achieve the reunification goal. In June 2017, father was entered as a party in the case and shortly thereafter DCF filed a proposed case plan that included father. The court did not adopt this plan into a disposition order, and in December 2017, the court stated that the July plan was out of date and ordered that an updated plan be filed. DCF then filed a revised permanency plan in February 2018, with a goal of terminating father's parental rights and adoption. At the same time, the State filed a petition to terminate father's rights. Father was not part of a case plan that had a goal of reunification and did not have an opportunity to demonstrate an ability to parent M.P.[4]

¶ 26. In evaluating whether there was a change of circumstances, the family court found that father had complied with most of the case plan goals set out in the proposed case plan that was not part of a disposition order, but had not been able to comply with the important goal of developing a parental relationship with M.P. Father had fifteen visits of one or two hours each during 2017 and 2018, which the court found was insufficient for M.P. to form a relationship or

---

[4] We note that father could have, but did not, bring a parentage action in Alabama seeking to establish his parental rights.

11

real attachment with father. The concept of stagnation does not fit father's situation. The court could not find that father's progress had stagnated because there were no expectations in an approved case plan and disposition order relative to father.

¶ 27. Nonetheless, the record as a matter of law demonstrates that there was a different kind of change of circumstances warranting modification of the existing disposition order. Parental stagnation is just one way to show changed circumstances, and the statutory standard may be met in other ways. See In re D.C., 2012 VT 108, ¶ 16, 193 Vt. 101, 71 A.3d 1191 (concluding that change of circumstances established by father's relinquishment of parental rights and death of grandmother, who was conditional custodian). Here, changed circumstances arise from the identification of father, who had previously acted as a caretaker for M.P., as a legal parent not previously identified or recognized in the approved case plan adopted in the disposition order. Having identified father as a legal parent, the court had to make some determination of disposition as to father—whether it decided to terminate his parental rights, pursue reunification, or establish some other disposition goal. The change in the identity of M.P.'s legal parents amounted to "a change in circumstances" requiring "action to serve the best interests of the child" under the statute. 33 V.S.A. § 5113(b).

¶ 28. At the same time that DCF filed a proposed case plan, it also filed a petition to terminate parents' rights. To terminate father's parental rights, the court had to consider M.P.'s best interests. Id. § 5114(a) (explaining that when petition to terminate parental rights is filed, court must consider child's best interests and listing factors to consider). Of the best-interests factors, the most important is whether a parent can resume parental duties within a reasonable period of time as measured from the perspective of the child's needs. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325, 97 A.3d 882. We will affirm the court's findings unless clearly erroneous and affirm the court's conclusions if supported by the findings. Id.

¶ 29. Here, the family court found that termination of father's rights was in M.P.'s best interests. The court found the following relative to the best-interests factors: (1) M.P. has a strong, bonded relationship with her foster parents and extended family but little relationship with father; (2) M.P. is fully and comfortably adjusted to her foster home and community; (3) father will not be able to resume parenting M.P. within a reasonable period of time because he did not relocate to Vermont and spend significant amounts of time to establish a relationship with M.P.; and (4) father does not play a significant role in M.P.'s life and she is not bonded to him.

¶ 30. The shortcoming in the family court's analysis is that it is based entirely on father's stagnation as supporting termination of parental rights in the best interest of the child, which is a theory, as we discussed above, that was inapplicable. We reiterate that stagnation was inapplicable in the absence of a disposition order of the court that included a case plan that father had to follow. Therefore, we reverse the court's decision terminating father's parental rights.

¶ 31. We recognize that we could end this opinion here and leave it to the family court to determine what next steps to take in a new disposition hearing. Given the unique circumstances of this case, the strong interest of all parties, particularly the child, in as expeditious a decision as possible, and the need fully to address father's arguments, we believe more guidance is necessary. The open question is whether father must have the opportunity to litigate his claim that the child never should have been placed with DCF but instead should have been returned to him to parent. We conclude that father has the right to litigate that question in a new disposition hearing.

¶ 32. This is not our first case in which a biological father not married to the mother at time of birth appeared late in a CHINS case and sought to assert his parental rights. In In re C.L., 2005 VT 34, 178 Vt. 558, 878 A.2d 207 (mem.), the juvenile's biological father was initially unknown and not identified until about a year after the juvenile had been taken into custody. The trial court terminated his parental rights based on an evaluation of the juvenile's best interests, finding that the juvenile was bonded with her foster family, that the father played no role in her

13

life, and that the father would not be able to assume parenting within a reasonable period of time because attempting a transition "would be emotionally devastating" to the juvenile and the time required would be too long as measured from the juvenile's needs.  Id. ¶ 8.  On appeal, the father argued that termination was improper absent an express finding of unfitness.  This Court examined the constitutional rights of unwed biological fathers and concluded that fit biological fathers must assert their parental rights, or they risk losing them.  As the U.S. Supreme Court has explained,

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection. . . .
>
> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.  If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

Lehr v. Robertson, 463 U.S. 248, 261-62 (1983) (quotations and footnote omitted); see Columbia v. Lawton, 2013 VT 2, ¶ 22, 193 Vt. 165, 71 A.3d 1218 (explaining that parent's constitutional interest does "not arise solely by virtue of a genetic connection between parent and child").

¶ 33.   The factual situation in this case is different from In re C.L.  Here, father had a parental relationship with M.P. in her early life, was cut off from contact with M.P. due to actions of others, and then acted promptly to assert his parental rights.  The court found: father was involved in M.P.'s life during the first seven months she resided in Alabama and assisted in parenting her, including providing for her medical needs; father was unaware of mother's and husband's plan to move to Vermont; after the move, father tried to interject himself in the Vermont proceeding before he was identified as M.P.'s biological father; and father took steps to file a

parentage action in Alabama, but received legal advice against it.  In other words, father had acted as M.P.'s parent, asserted his rights in a timely manner, and there was no evidence presented to demonstrate that father had any parenting deficits relative to M.P. or that placement with father would be detrimental to M.P.

¶ 34.   Father argues that he should have been able to show his fitness to parent and obtain custody of M.P. on both constitutional and statutory grounds.  We note that we have generally held that Vermont's statutory process and standards of fitness comply with due process of law.  In re D.C., 2012 VT 108, ¶¶ 21-22.  In any event, this case can be decided on statutory grounds and therefore we do not reach father's constitutional arguments.

¶ 35.   At disposition, the court must make orders related to the custody of a child who was found at merits to be CHINS "as the court determines are in the best interest of the child."  33 V.S.A. § 5318(a).  The statute contains four criteria to consider in determining the best interest of the child.  Id. § 5114(a).  The most important of the factor is "the likelihood that the parent will be able to resume or assume parental duties within a reasonable period of time."  Id. § 5114(a)(3); In re B.M., 165 Vt. 194, 199, 679 A.2d 891, 895 (1996).  We have held that

> this criterion expresses "a general policy that total termination of parental rights will not be ordered in the first instance if there is a reasonable possibility that the causes and conditions that led to the filing of the petition can be remedied and the family restored within a reasonable period of time."

In re B.M., 165 Vt. at 199, 679 A.2d at 895 (quoting In re D.R., 136 Vt. 478, 481, 392 A.2d 951, 953 (1978)).  We have also held "[i]t is at the disposition hearing where 'the determination of parental unfitness, which triggers the transfer of custody away from the parents, must be made.' " In re B.R., 2014 VT 37, ¶ 14 (quoting In re R.L, 148 Vt. 223, 227, 531 A.2d 909, 911 (1987)).

¶ 36.   The family court's findings indicate that father was not involved in the circumstances that caused the CHINS determination and that father was unaware of M.P.'s circumstances until after the CHINS proceeding commenced.  Thus, the CHINS findings do not

show that father was or is unable to assume parental duties.  He is entitled to a disposition hearing which includes allowing him to demonstrate that he is able to assume parental duties and that M.P. should be placed with him.

¶ 37.    This is not, however, a holding that upon father's showing that he is able to assume parental duties, the family court must order that custody of the child be granted to father pending reunification or as a final disposition.  The court must consider all the criteria in making its best-interest determination as to a disposition goal and custody pending final disposition.  33 V.S.A. § 5318(a).  Nor is it a holding that the passage of time since father entered the proceeding is irrelevant.  Father was a noncustodial parent at the time of the commencement of this proceeding. See id. § 5102(18), (20).  Because of this status, 33 V.S.A. § 5318(e) applies and before granting him legal custody of M.P., the court must find that father is a suitable person to assume custody and the placement with him is safe and appropriate.  In making findings on father's suitability, the court may require a home study, as we note in the next section of this opinion.  Given that a disposition plan with a custodial order was in place, and father is a noncustodial parent seeking to modify that disposition, father bears the burden of demonstrating that the disposition order should be modified and custody of M.P. should be granted to him.  The State retains the burden of proving by clear and convincing evidence that termination is in the child's best interest if and when a petition to terminate father's parental rights is filed.

IV.  ICPC Home Study

¶ 38.    Father also contends that the family court erred in requiring an ICPC home study of his residence before allowing M.P. to be placed with him.  The ICPC's purpose is to place children "in a suitable environment" and to allow authorities in another state where the child is to be placed to "have full opportunity to ascertain the circumstances of the proposed placement."  33 V.S.A. § 5901(1), (2).  Father argues that the statute exempts parents when it states that it does not apply to "the sending or bringing of a child into a receiving state by his or her parent, step-parent,

16

grandparent, adult brother or sister, adult uncle or aunt, or his or her guardian and leaving the child with any such relative or nonagency guardian in the receiving state." Id. § 5908(1). Father asserts that it was error to require an ICPC study before placing M.P. in his home.

¶ 39.    Father did not preserve this argument below. M.P.'s DCF caseworker submitted an ICPC request to Alabama to assess the appropriateness of father's home for M.P.'s placement. Father does not identify any motion or argument he made to the court challenging this process. At the termination hearing, father's attorney began to question the DCF caseworker regarding the request for an ICPC application for father's home and particularly about what the attorney identified as "ICPC Regulation number 3." The family court stated that the regulation was not applicable in Vermont and that DCF's practice was to request an ICPC application for every parent. Father's attorney then withdrew the question. On redirect, the caseworker testified that DCF's policy is to require ICPC applications for parents who live out of state. Father did not raise any objection to the requirement of an ICPC home study or argue that one was not required under the statute now identified on appeal.

¶ 40.    Nonetheless, because the issue will likely arise on remand, we consider whether the family court is precluded from ordering an ICPC study before placing a child with an out-of-state parent. We conclude that the statute allows the court to order an ICPC home study. The statutory language exempting "the sending or bringing of a child into a receiving state by his or her parent," Id. § 5908(1), does not preclude the court from asking for an ICPC study when the court is considering whether to place a child with a noncustodial parent out of state. The language "by his or her parent" indicates that it applies when a parent, having custody of a child, sends or brings a child into a state. See In re A.W., 2013 VT 107, ¶ 5, 195 Vt. 226, 87 A.3d 508 (explaining that when interpreting a statute, this Court applies plain meaning and when uncertain considers entire statute and its meaning). It does not apply in a situation where a child in DCF custody is being placed by the State. This construction is consistent with the overall purpose and policy of the

ICPC, which includes making sure that a child is placed in "a suitable environment." 33 V.S.A. § 5901(1). As explained above, an ICPC study will provide important information on "the suitability of [father] to assume legal custody of the child and the safety and appropriateness of the placement." Id. § 5318(e).

## V. Reasonable Efforts

¶ 41. Father's final argument is that the court erred in finding that DCF made reasonable efforts to reunify him with M.P. Father misstates the court's obligation. The court is required to find that DCF made reasonable efforts to finalize a permanency plan for M.P., which at the time was termination of parental rights. See id. § 5321(h). Prior to making this finding, the court asked the parties if there was an objection to the court making such a finding and father's attorney indicated that he had no objection. Having agreed to this finding below, father cannot now challenge it on appeal.

We affirm the order terminating mother's parental rights and the order concerning reasonable efforts; we reverse and remand the order terminating father's parental rights.

FOR THE COURT:

_____
Chief Justice